# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――

Argued March 17, 2005          Decided July 26, 2005

No. 04-7116

WILLIAM GOLDRING,
PARENT AND NEXT FRIEND OF
LAWRENCE ANDERSON, A MINOR, *ET AL.*,
APPELLANTS

v.

DISTRICT OF COLUMBIA,
A MUNICIPAL CORPORATION AND
CLIFFORD B. JANEY, OFFICIALLY AS
SUPERINTENDENT, D.C. PUBLIC SCHOOLS,
APPELLEES

―――

Appeal from the United States District Court
for the District of Columbia
(No. 02cv01761)

―――

*Michael J. Eig* argued the cause for the appellants. *Haylie M. Iseman* was on brief.

*Donna M. Murasky*, Assistant Attorney General, District of Columbia argued the cause for the appellees. *Robert J. Spagnoletti*, Attorney General, District of Columbia and *Edward*

*E. Schwab*, Deputy Attorney General, District of Columbia, were on brief.

Before: SENTELLE, HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Circuit Judge* ROGERS.

KAREN LECRAFT HENDERSON, *Circuit Judge*: After prevailing in administrative proceedings against the District of Columbia and District of Columbia Public Schools (collectively, the District) under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1487, the appellants—five children with disabilities and their parents—sued under the IDEA's fee-shifting provision, *id.* § 1415(i)(3)(B), to recover a portion of their costs that the District refused to pay. The district court granted summary judgment partially in their favor, but declined to include in their award fees paid to expert witnesses beyond the amounts permitted under 28 U.S.C. §§ 1821 and 1920.[1] *See Goldring v. Dist. of Columbia*, No. 02-CV-1761, slip op. at 1-10 (D.D.C. May 26, 2004), *reprinted in* Joint Appendix (J.A.) at 98-107. They now appeal, alleging that the district court erred because, as they see it, an award of expert witness fees to a party prevailing under the IDEA is not so limited. The question before us thus is whether "reasonable attorneys' fees as part of the costs," words that are used in section 1415, encompass "expert fees," words that are not. 20 U.S.C. § 1415(i)(3)(B). We say no—and therefore affirm the district court—because under United States Supreme Court precedent section 1415 of the IDEA precludes the awarding of expert witness fees as part of a prevailing party's costs.

---

[1] Section 1821 provides that "[a] witness shall be paid an attendance fee of $40 per day for each day's attendance." 28 U.S.C. § 1821(b).

**I.**

To "ensure that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs," 20 U.S.C. § 1400(d)(1)(A), the IDEA conditions eligibility for federal education assistance on a state's implementation of "policies and procedures to ensure" that resident children "who are in need of special education and related services" are "identified, located, and evaluated" and receive "[a]n individualized education program." *Id.* § 1412(a)(3)-(4). Each child's individualized education program, or IEP, must be developed by a "team" including the child's parents, at least one "regular education teacher" and one special education teacher, a local educational agency representative who is knowledgeable about the school's "general education curriculum" and "the availability of resources" and—"whenever appropriate"—the disabled child himself. *Id*. § 1414(d)(1)(B)(i)-(iv), (vii); *see Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 518-19 (D.C. Cir. 2005). Among other things, the IEP must contain a statement of the child's current performance level and "the special education and related services" the child will receive from the school. *Id.* § 1414(d)(1)(A)(i), (iii). Parents dissatisfied with "any matter relating to" their child's "identification, evaluation, or educational placement" or "the provision of a free appropriate public education" to him, *id.* § 1415(b)(6), may lodge their complaints with a state educational agency and have their complaints aired at an impartial due process hearing, *see id.* § 1415(f)(1), where they are accorded "the right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities," *id.* § 1415(h)(1). Under the IDEA's fee-shifting provision, the district court "in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." in such a proceeding or court action. *Id.* § 1415(i)(3)(B).

Exercising their statutory rights under the IDEA, the appellant parents complained to the District about their children's educational placements. Following due process hearings, they requested the District to reimburse their fees and costs pursuant to the IDEA's fee-shifting statute. With respect to four of the children,[2] the District did not dispute that their parents were the prevailing parties and paid a portion of their requested fees. The parents and children sued to recover the balance.

The district court granted partial summary judgment in their favor. *See Goldring*, No. 02-CV-1761, slip op. at 10. Relevant to this appeal, it concluded that they could not recover the entirety of their expert fees, "but instead must be limited to no more than what 28 U.S.C. §§ 1821 and 1920 permit." *Id.* at 9. According to the district court, because Supreme Court precedent holds that " 'when a prevailing party seeks reimbursement for fees paid to its own expert witnesses, a federal court is bound by the limit of [section] 1821(b), absent contract or explicit statutory authority to the contrary,' " the critical question was "whether the IDEA provides such 'explicit statutory authority' permitting recovery of expert witness fees." *Id.* at 8 (quoting *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 439 (1987)). The IDEA did not, it concluded; therefore, it awarded the appellants only $120.00 in expert witness fees—not the $6,836.50 they sought. *Id.* at 10.

The appellants sought reconsideration but were no more successful. *See Goldring v. Dist. of Columbia*, No. 02-CV-1761,

---

[2] Because Keith Murfee's parents' hearing request was dismissed after their counsel withdrew the request, *see* J.A. 87, the District disputed that Keith Murfee was a prevailing party, *see* J.A. 96. The district court agreed, holding that he had not prevailed because the benefits he received were attained by virtue of a private agreement with "no involvement by the hearing officer." *Goldring*, No. 02-CV-1761, slip op. at 5. This appeal does not challenge that holding.

slip op. at 1-10 (D.D.C. July 21, 2004), *reprinted in* J.A. at 113-20.  The district court rejected both of their arguments—that is, that our decision in *Moore v. Dist. of Columbia*, 907 F.2d 165 (D.C. Cir. 1990), held that a prevailing party is entitled to an award of expert fees under the IDEA and that the IDEA's legislative history demonstrates that the Congress intended a party prevailing under the IDEA to recover expert fees.  *See Goldring*, No. 02-CV-1761, slip op. at 3-8.

The parents and children timely appealed on July 28, 2004.  We have jurisdiction to entertain their appeal, *see* 28 U.S.C. § 1291, and on *de novo* review, *see, e.g., Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995), we affirm the district court.

## II.

The question whether the IDEA's fee-shifting provision—section 1415—enables a prevailing party to recover expert fees as part of his costs is one of first impression in our Circuit and one not free of controversy in others.  To date four of our sister circuits have treated this issue and divided evenly into opposing camps, two holding an IDEA prevailing party cannot recover expert fees, *see T.D. v. LaGrange Sch. Dist. No. 102*, 349 F.3d 469, 481-82 (7th Cir. 2003); *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1031-33 (8th Cir. 2003), two holding he can, *see Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 402 F.3d 332, 337-39 (2d Cir. 2005); *Arons v. N.J. Bd. of Educ.*, 842 F.2d 58, 62 (3d Cir. 1988).  The district courts have likewise failed to reach a consensus on the question, *compare*, *e.g.*, *BD v. DeBuono*, 177 F. Supp. 2d 201, 207-08 (S.D.N.Y. 2001) (allowing recovery of expert fees); *Mr. J. v. Bd. of Educ.*, 98 F. Supp. 2d 226, 242-43 (D. Conn. 2000) (same); *Field v. Haddonfield Bd. of Educ.*, 769 F. Supp. 1313, 1323 (D.N.J. 1991) (same), *with Eirschele v. Craven County Bd. of Educ.*, 7 F. Supp. 2d 655, 659-60 (E.D.N.C.1998) (refusing recovery of expert fees); *Cynthia K. v. Bd. of Educ. of Lincoln-Way High Sch. Dist.*, 1996 WL 164381, at \*2 (N.D. Ill., April 1, 1996)

(same), including those within our Circuit, *compare*, *e.g.*, *Czarniewy v. Dist. of Columbia*, No. 02-CV-1496, slip op. at 4-5 (D.D.C. Mar. 25, 2005) (allowing recovery of expert fees); *Bailey v. Dist. of Columbia,* 839 F. Supp. 888, 892 (D.D.C. 1993) (same); *Aranow v. Dist. of Columbia*, 791 F. Supp. 318, 318 (D.D.C. 1992) (same), *with George v. Dist. of Columbia*, No. 02-CV-1656, mem. at 2 (D.D.C. Mar. 8, 2004) (refusing recovery of expert fees); *Goldring*, No. 02-CV-1761, slip op. at 9 (same). The correct decision does not seem to us to be difficult to reach, for the Supreme Court has stated in fairly unequivocal terms that language nearly identical to that used in section 1415 is unambiguous and, more to the point, does not allow a prevailing party to shift his expert fees. Accordingly, today we join the Seventh and Eighth Circuits in holding that a prevailing party under the IDEA cannot recover expert fees.

The IDEA's fee-shifting provision provides that "[i]n any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B). That the crucial statutory language—"reasonable attorneys' fees as part of the costs," *id.*—fails to allow a prevailing party to shift his expert fees flows directly from the application of two Supreme Court decisions. One tells us that "when a prevailing party seeks reimbursement for fees paid to its own expert witnesses a federal court is bound by the limit of § 1821(b) absent contract or explicit statutory authority to the contrary." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 439 (1987). The other tells us that the IDEA's fee-shifting provision contains no such "explicit statutory authority to the contrary." *See W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83 (1991).

In *Casey*, the Court addressed whether an earlier version of 42 U.S.C. § 1988, which provided that "the court, in its discretion, may allow the prevailing party . . . a reasonable

attorney's fee as part of the costs," satisfied the *Crawford Fitting Co.* "explicit statutory authority" test. *Id.* at 87. The Court concluded that it did not. *Id.* at 97. Looking to the "record of statutory usage," it explained that, "[w]hile some fee-shifting provisions, like § 1988, refer only to 'attorney's fees,' . . . many others explicitly shift expert witness fees *as well as* attorney's fees." *Id.* at 88 (emphasis in original). By the Court's count, "[a]t least 34 statutes in 10 different titles of the United States Code explicitly shift attorney's fees *and* expert witness costs." *Id.* at 89 (emphasis in original); *see id.* at n.4. In view of a record of usage that demonstrated "beyond question" that attorney's fees and expert witness fees are "distinct items of expense," the Court concluded that, if it were to hold that "the one includes the other, dozens of statutes referring to the two separately become an inexplicable exercise in redundancy." *Id.* at 92. Not surprisingly, the Court declined to so hold. Accordingly, because section 1415 and the version of section 1988 construed in *Casey* contain materially identical language and *Casey* held that section 1988's language does not enable a prevailing party to shift his expert fees, we cannot but conclude that section 1415 does likewise. That is the end of the matter for us.

But it is not the end for the appellants. Finding the statute's text unhelpful, they seek refuge in its history. Legislative history is a traditional tool of statutory construction to divine congressional intent, they argue, and, when considered here, it reveals an intent to allow a prevailing party to shift expert fees under section 1415. The appellants point to a single sentence in the House Conference Report on the Handicapped Children's Protection Act (Conference Report), which amended the IDEA:

> The conferees intend that the term "attorney's fees as part of the costs" include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which

is found to be necessary for the preparation of the parent or guardian's case in the action or proceeding, as well as traditional costs incurred in the course of litigating the case.

H.R. CONF. REP. NO. 99-687, at 5 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1789, 1808. While two of our sister circuits have looked to this language in construing section 1415, *see Murphy*, 402 F.3d at 336-37; *Arons*, 842 F.2d at 62, we believe recourse to it is simply unwarranted.

While "[r]eference to statutory design and pertinent legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears superficially clear," *Natural Res. Def. Council v. Browner*, 57 F.3d 1122, 1127 (D.C. Cir. 1995) (internal quotation marks omitted); *accord, e.g., Sierra Club v. EPA*, 353 F.3d 976, 988 (D.C. Cir. 2004); *Consumer Elec. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. 2003), we do not confront "superficially clear" language here. In *Casey*, the Supreme Court said that the expression "reasonable attorneys' fees as part of the costs" *is* clear, not just superficially so. *See* 499 U.S. at 98-99 (rejecting argument that section 1988's purpose must overcome ordinary meaning of statutory terms because "[w]here [statutory text] contains a phrase that is unambiguous—that has a clearly accepted meaning in both legislative and judicial practice—we do not permit it to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process"). This is good enough for us for "when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) (internal quotation marks omitted); *see also Ratzlaf v. United States,* 510 U.S. 135, 147-48 (1994) (courts should "not resort to legislative history to cloud a statutory text that is clear"); *Davis v. Michigan Dep't of*

*Treasury*, 489 U.S. 803, 808-09 n.3 (1989) ("Legislative history is irrelevant to the interpretation of an unambiguous statute."). In our view this case represents a paradigmatic one for application of the principle that statutory text enacted by the Congress trumps the views expressed by one of its committees.[3] *See Neosho R-V Sch. Dist.*, 315 F.3d at 1032 ("Absent some ambiguity in the statute, we have no occasion to look to legislative history."); *accord T.D.*, 349 F.3d at 482. As we said last term, "there would be no need for a rule – or repeated admonition from the Supreme Court – that there should be no resort to legislative history when language is plain and does not lead to an absurd result, if the rule did not apply precisely when plain language and legislative history may seem to point in opposite directions." *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 494-95 (D.C. Cir. 2004).

Continuing down this path, the appellants maintain that the Conference Report gains additional relevance in light of the Supreme Court's apparent reliance on it in *Casey*. The appellants are not alone in this view: In reaching a holding contrary to our own, the Second Circuit found the *Casey* Court's characterization of this snippet of legislative history as "an apparent effort to depart from ordinary meaning and to define a term of art," 499 U.S. at 91 n.5, to support its construction of section 1415. *See Murphy*, 402 F.3d at 336-38. "[A]pparent" or

---

[3] At oral argument, there was some discussion whether the Congress voted on the language of the Conference Report the appellants rely on. *See* Tr. of Oral Argument at 4:10. We have explained before that "[w]hile both the conference report and the joint explanatory statement are printed in the same document, Congress votes only on the conference report," which contains the "formal legislative language." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 236 (D.C. Cir. 2003). The language the appellants rely on is from the "joint explanatory statement," *see* H.R. CONF. REP. NO. 99-687, at 5 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1789, 1808, and thus has no force of law. *See id.* at 237.

no, we conclude, as have two other circuits, *see T.D.*, 349 F.3d at 482; *Neosho R-V Sch. Dist.*, 315 F.3d at 1032, that the Conference Report's "effort" is a failure. A sentence in a conference report cannot rewrite unambiguous statutory text, particularly text with a Supreme Court-tested and -approved meaning. The *Casey* holding declares that "[w]here [the statute] contains a phrase that is unambiguous—that has a clearly accepted meaning in both legislative and judicial practice—we do not permit it to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process." 499 U.S. at 99-100 (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).

Nor are we convinced to reach a different result by the appellants' other arguments derived from the *Casey* Court's footnote reference to the Conference Report. First, we are unpersuaded by the fact that the Justice who included the footnote is a reputed textualist. *See Murphy*, 402 F.3d at 337 ("To those who would question our resort to legislative history, we observe that it was Justice Scalia, a noted skeptic of the use of legislative history, who authored *Casey*'s dicta about the apparent effort by Congress to depart from the ordinary meaning of the term 'costs' in the IDEA."). If the Court had found this one sentence of legislative history compelling, it would have included section 1415 in its catalogue of statutes authorizing a prevailing party to shift attorney's fees as well as expert fees. In other words, the Court would have counted "[a]t least" 35 such statutes, not 34. *Casey*, 499 U.S. at 89.

Second, we cannot agree with the Second Circuit that "it [is] reasonable to infer that Congress, on the basis of the Supreme Court's decision in *Casey*, saw no need to amend the IDEA because the Court had recognized that, in enacting the IDEA, Congress sufficiently indicated in the Conference Committee Report that prevailing parties could recover expert fees under the Act." *Murphy*, 402 F.3d at 337. While the Supreme Court

has instructed us that "[t]he fact that inaction may not always provide crystalline revelation . . . should not obscure the fact that it may be probative to varying degrees," *Johnson v. Transp. Agency of Santa Clara Cty.*, 480 U.S. 616, 629 n.7 (1987); *accord United States v. Delgado-Garcia*, 374 F.3d 1337, 1359 (D.C. Cir. 2004), we doubt that the Congress's inaction with respect to section 1415 following *Casey* is probative at all. More to the point, given that the *Casey* Court merely labeled the Conference Report an "apparent effort" by the congressional committee and did not number section 1415 among the statutes authorizing the recovery of attorney's fees *and* expert fees, we are unwilling to infer from the Congress's failure after *Casey* to amend section 1415 that the Congress believed that the Supreme Court had considered the text to have been altered by the Conference Report. Indeed, given that the version of section 1988 construed in *Casey* is nearly identical to section 1415, the more reasonable inference to draw from the fact that, following *Casey*, the Congress amended section 1988 but not section 1415 is that the Congress had no intention of allowing recovery of expert fees under the IDEA. Before the Court handed down *Casey*, the Congress had a proven track record demonstrating its ability to shift expert fees when it desired and, following the Court's decision, the Congress was—and is—unquestionably on notice of the precise language required to do so. The former inferential path, in any event, leads to where reason goes to die.

Moving from Supreme Court precedent to our own, the appellants cite our decision in *Moore v. Dist. of Columbia*, 907 F.2d 165 (D.C. Cir.) (en banc), *cert. denied*, 488 U.S. 998 (1990), as well as the procedural history leading up to it, for the proposition that we have long allowed an IDEA prevailing party to recover expert fees. In *Moore*, however, we addressed only the issue "whether the Handicapped Children's Protection Act . . . authorizes a court to award attorney fees to a party who has prevailed in an administrative proceeding under the Education of the Handicapped Act," *id.* (internal citations omitted), and

"conclude[d] that both the text and the legislative history of HCPA evidence congressional intent to authorize recovery of fees by a parent who prevails in EHA administrative proceedings." *Id.* at 176. Our holding in *Moore* did not consider whether a prevailing party may shift his expert fees, as appellants themselves readily concede. *See* Appellants' Br. at 29 ("Th[e] [expert fees] issue simply was never addressed.").

The appellants' last argument is that, given the critical role of professional opinion in assessing the educational needs of a child with disabilities, the upshot of denying an IDEA prevailing party expert fees will be that parents seeking to contest a school district's educational placement may face a severe informational disadvantage vis-à-vis the school district. While we are not unsympathetic to the challenges that these and other parents often confront in securing an appropriate free education for their children with disabilities, this line of argument—based on considerations of public policy rather than statutory interpretation—is, in our view, addressed to the wrong branch of government under our constitutional design. Our job is to interpret the law as it is, not as it should be. *See Neosho R-V Sch. Dist.*, 315 F.3d at 1033 (" '[T]he problems of public policy are for the legislature and [the court's] job is one of interpreting statutes, not redrafting them.' " (quoting *Welsh v. Boy Scouts of Am.*, 993 F.2d 1269, 1270-71 (7th Cir. 1993))). Accordingly, a prevailing party under the IDEA may shift expert fees only to the extent allowed under sections 28 U.S.C. §§ 1821 and 1920.[4]

---

[4] While the appellants contend that 28 U.S.C. § 1821 is inapplicable in this context because it is limited to court witnesses, *see* 28 U.S.C. § 1821(a)(1) ("[A] witness in attendance at any court of the United States, or before a United States Magistrate Judge, or before any person authorized to take his deposition pursuant to any rule or order of a court of the United States, shall be paid the fees and allowances provided by this section."), we find their argument, which they raised for the first time in their reply brief, untimely. *See, e.g., Presbyterian Med. Ctr. of the Univ. of Penn. Health Sys. v. Shalala,* 170 F.3d 1146,

Finally, a word or two about our colleague's dissent. Of course, the Congress may adopt a term of art in a fee-shifting statute. *See Casey*, 499 U.S. at 91 n.5. Of course, a conference report offers " 'persuasive evidence of congressional intent' *after statutory text itself*." *Moore*, 907 F.2d at 175 (quoting & citing *Demby v. Schweicker*, 671 F.2d 507, 510 (D.C. Cir. 1981)) (emphasis added). But the words of the statute do indeed enjoy pride of place: Our "inquiry into the Congress's intent proceeds, as it must, from 'the fundamental canon that statutory interpretation begins with the language of the statute itself.' " *Am. Fed'n of Labor & Congress of Indus. Orgs. v. Fed. Elec. Comm'n*, 333 F.3d 168, 180 (D.C. Cir. 2003) (Henderson, J., concurring in judgment) (quoting & citing *Butler v. West*, 164 F.3d 634, 639 (D.C. Cir. 1999)). Thus job one is to read the statute, read the statute, read the statute. *See Am. Fed'n of Labor & Congress of Indus. Orgs.*, 333 F.3d at 180 (Henderson, J., concurring in judgment) (citing HENRY J. FRIENDLY, BENCHMARKS 202 (1967) ("(1) Read the statute; (2) read the statute; (3) read the statute!" (quoting Justice Frankfurter's "threefold imperative to law students"))). Moreover, we do not read section 1415 in a precedential vacuum. Despite the dissent's characterization of *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 439 (1987), as allowing a court to "impl[y]" or "infer" "explicit statutory authority" to shift expert fees, Dissent at 7, 9, the Supreme Court held otherwise in *Casey* in deciding "whether the term 'attorney's fee' in § 1988 provides the 'explicit statutory authority' required by *Crawford*

---

1152 (D.C. Cir. 1999) (court need not consider argument raised for first time in reply brief). In any event, we agree with the Eighth Circuit that "the specific language of the IDEA broadens the application of the general cost statutes by permitting the court to 'award reasonable attorneys' fees as part of the costs' 'in any action *or proceeding* brought under this section.' " *Neosho R-V Sch. Dist.*, 315 F.3d at 1031-32 (citing 20 U.S.C. § 1415(i)(3)(B) & emphasis in original).

*Fitting*" to shift expert fees. *Casey*, 499 U.S. at 87. It held that the term "unambiguous[ly]" does not; the term "has a clearly accepted meaning in both legislative and judicial practice," a meaning not "expanded or contracted by the statements of individual legislatures or *committees*." *Id.* at 98 (emphasis added). Accordingly, the dissent's observation that "nothing in *Casey* precludes reference to legislative history clearly indicating that Congress intends to depart from the ordinary meaning of a statutory phrase and to define that phrase as a term of art" proves nothing with respect to section 1415. Dissent at 6. Given that the Congress used a "restrictive" term in section 1415 and section 1988, *Casey*, 499 U.S. at 99, our applying the same "restrictive" meaning to it now can hardly be labeled an "overreading" of *Casey*. Dissent at 7. And given that the Supreme Court found the term *unambiguous*, our rejection of a legislative committee's differing gloss cannot, consistent with Supreme Court precedent and our own, fairly be described as allowing "the Court to trump Congress in defining statutory terms." Dissent at 5. To do otherwise would substitute the Congressional Record for the United States Code, as the Supreme Court cautioned us against in *Casey*. *See* 499 U.S. at 98. Thus, while the dissent "infer[s]" "a comprehensive statement of congressional intent" by reading a brief passage of legislative history, Dissent at 4, 9, we find no "explicit statutory authority" to shift expert fees in section 1415 by reading the words of the statute.

\* \* \*

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*

ROGERS, *Circuit Judge*, dissenting: In *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83 (1991), the Supreme Court construed the "ordinary meaning" of the term "attorney's fees" in 42 U.S.C. § 1988 not to include fees for experts' services. *Id.* at 91-92 & n.5. Listing 34 statutes that explicitly shift both attorney's fees and expert witness fees, *see id.* at 89 & n.4, the Court explained that "this statutory usage shows beyond question that attorney's fees and expert fees are distinct items of expense," *id.* at 92. The Court further explained that while lower courts may have relied previously on their equitable powers to shift fees for experts' services, they did not shift them as an element of attorney's fees, *see id.* at 92, and at the time § 1988 was enacted, "neither statutory nor judicial usage regarded the phrase 'attorney's fees' as embracing fees for experts' services," *id.* at 97. Thus, the Court concluded that the "clearly accepted meaning in both legislative and judicial practice" of the phrase "attorney's fees" was "unambiguous" and could not be "expanded or contracted by the statements of individual legislators or committees during the course of the enactment process." *Id.* at 98-99. The Court therefore held that the term "attorney's fees" in § 1988 did not provide the necessary "explicit statutory authority" to shift fees for experts' services beyond the limits set in 28 U.S.C. §§ 1821 and 1920. *Id.* at 86-87 (quoting *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 439 (1987)). While my colleagues treat this conclusion as "the end of the matter" because the fee-shifting provision of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(3)(B), contains the same language construed by the Court in *Casey*, Op. at 7, I conclude, in light of this court's en banc decision in *Moore v. District of Columbia*, 907 F.2d 165 (D.C. Cir. 1970) (en banc), that the Supreme Court's definition of the "ordinary meaning" of the term "attorney's fees" does not apply to the IDEA's fee-shifting provision because Congress clearly expressed its intent in the Conference Report to define the phrase "attorney's fees as part of the costs" as a term of art to include fees for experts' services.

2

*See* H.R. CONF. REP. NO. 99-687, at 5 (1986).[1]  Accordingly, I respectfully dissent.

The Joint Explanatory Statement in the Conference Report accompanying the fee-shifting provision of the IDEA states:

> The conferees intend that the term "attorneys' fees as part of the costs" include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the parent or guardian's case in the action or proceeding, as well as traditional costs incurred in the course of litigating a case.

*Id.*  In footnote 5 of the *Casey* opinion, the Supreme Court explained that this statement did not provide evidence of the "ordinary meaning" of the term "attorney's fees" in § 1988 because the "specification [in the Conference Report] would have been quite unnecessary if the ordinary meaning of the term included those elements.  The statement is an apparent effort to *depart* from ordinary meaning and to define a term of art." *Casey*, 499 U.S. at 91 n.5.  Thus, the Court recognized in footnote 5 that Congress could depart from the ordinary meaning of the statutory phrase in § 1988 by defining it as a term of art.  While the Second and Third Circuits view the Conference Report accompanying the IDEA's fee-shifting provision as persuasive evidence that Congress intended to authorize recovery of fees for experts' services in IDEA proceedings, *see Murphy v. Arlington Cent. Sch. Dist. Bd. of*

---

[1]  The Conference Report accompanied the Handicapped Children's Protection Act of 1986, which amended the IDEA to include a fee-shifting provision that was originally codified at 20 U.S.C. § 1415(e)(4)(B) and is currently codified at 20 U.S.C. § 1415(i)(3)(B).

*Educ.*, 402 F.3d 332, 337 (2d Cir. 2005); *Arons v. New Jersey State Bd. of Educ.*, 842 F.2d 58, 62 (3d Cir. 1987), my colleagues join the Seventh and Eighth Circuits in rejecting reliance on the Conference Report on the grounds that the Supreme Court in *Casey* defined the ordinary meaning of the term "attorney's fees" and that the "apparent effort" in the Conference Report to depart from that meaning was unsuccessful. *See* Op. at 10; *T.D. v. LaGrange Sch. Dist. No. 102*, 349 F.3d 469, 482 (7th Cir. 2003); *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1032 (8th Cir. 2003). In my view, that conclusion is inconsistent with this court's en banc decision in *Moore* and rests on a misreading of *Casey* and *Crawford Fitting*.

Sitting en banc, this court in *Moore* relied on a conference report as evidence of congressional intent to authorize recovery of attorney's fees incurred in IDEA administrative proceedings. *See Moore*, 907 F.2d at 175. In so doing, the court recognized that a conference report "'is the most persuasive evidence of congressional intent' after statutory text itself." *Id.* (quoting *Demby v. Schweicker*, 671 F.2d 507, 510 (D.C. Cir. 1981)). Similarly, in relying on the Conference Report accompanying the IDEA's fee-shifting provision as evidence of congressional intent to allow the shifting of fees for experts' services in IDEA proceedings, the Second Circuit in *Murphy* explained why a joint explanatory statement in a conference report is more persuasive as evidence of legislative intent than a committee report prepared before either the House or the Senate has passed a bill. *See Murphy*, 402 F.3d at 337. Because a conference report "represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent." *Id.* (quoting *Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000)). Although my colleagues observe that Congress does not vote on the joint explanatory statement, *see* Op. at 9 n.3 (citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 236 (D.C. Cir.

2003)), it is nonetheless true that in voting on the statutory language agreed to by the House and Senate conferees, Congress can reasonably be understood to accept the joint explanatory statement as the intended meaning of the statutory text. *See Moore*, 907 F.2d at 176; *see also Murphy*, 402 F.3d at 337 (citing ROBERT A. KATZMANN, COURTS AND CONGRESS 63-64 (1997)). As conference reports are often terse statements unaccompanied by the kind of extended analysis contained in the initial reports of the individual committees of the House and Senate, the fact that the Conference Report accompanying the fee-shifting provision of the IDEA contains only a "single sentence" on fees for experts' services is not a reason for rejecting its persuasive force, Op. at 7, especially when that sentence is a comprehensive statement of congressional intent on the subject.

While, as my colleagues point out, Op. at 8-9, the Supreme Court has held that there is no occasion to resort to legislative history when the statutory language is clear, the Court has also held that the "'strong presumption' that the plain language of the statute expresses congressional intent [can be] rebutted . . . when a contrary legislative intent is clearly expressed," such as a "conclusive statement in the legislative history." *Ardestani v. INS*, 502 U.S. 129, 135-36 (1991) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)) (internal citation omitted). Indeed, because the ultimate purpose of statutory construction is to effectuate congressional intent, *cf. Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001), a statutory phrase is to be given its ordinary meaning only "[i]n the absence of persuasive reasons to the contrary." *Banks v. Chicago Grain Trimmers Ass'n*, 390 U.S. 459, 465 (1968); *Nat'l Insulation Transp. Comm. v. ICC*, 683 F.2d 533, 537 (D.C. Cir. 1982). Although the Court in *Casey* found no persuasive evidence of congressional intent to depart from the ordinary meaning of the term "attorney's fees" in § 1988, *see* 499 U.S. at 98, here the

Conference Report accompanying the IDEA's fee-shifting provision clearly and conclusively states Congress's intent to define the phrase "attorney's fees as part of the costs" as a term of art to include fees for experts' services. To apply the Supreme Court's definition of the ordinary meaning of the term "attorney's fees" to the IDEA in the face of contrary legislative intent is to allow the Court to trump Congress in defining statutory terms. While my colleagues correctly point out that the "inquiry into the Congress's intent . . . *begins* with the language of the statute," Op. at 13 (quoting *Am. Fed'n of Labor & Congress of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168, 180 (D.C. Cir. 2003) (Henderson, J., concurring in the judgment) (emphasis added)), they fail to acknowledge that it does not always end there. The situation might be somewhat different had the Court in *Casey* purported to define "attorney's fees" as a term of art, as it did with the term "prevailing party" in *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598, 604-05 (2001). Even in that situation, this court and other circuits have recognized that the Supreme Court's definition of "prevailing party" in *Buckhannon* is only presumptive and that "some good reason" may compel the court to construe the term differently in a different statute. *Oil, Chem. & Atomic Workers Int'l Union v. Dep't of Energy*, 288 F.3d 452, 455 (D.C. Cir. 2002); *see also Doe v. Boston Pub. Sch.*, 358 F.3d 20, 25-26 (1st Cir. 2004); *T.D.*, 349 F.3d at 475 (7th Cir. 2003).

Thus, while the Court in *Casey* reasoned that construing the phrase "attorney's fees" in § 1988 to include fees for experts' services would render superfluous the statutory language in the 34 statutes explicitly shifting both attorney's fees and expert fees, *see* 499 U.S. at 92, it did so in the context of defining the ordinary meaning of the term "attorney's fees," recognizing in footnote 5 the possibility that Congress could depart from the ordinary meaning of the term by defining the statutory phrase as

a term of art. Moreover, while the Court in *Casey* took pains to demonstrate that the term "attorney's fees" had a "clearly accepted meaning in both legislative and judicial practice" at the time § 1988 was enacted, *id.* at 98, it offered only a conclusory response to the dissent's position that fees for experts' services were part of "costs." *Id.* at 87 n.3. Finally, while the Court in *Casey* warned that legislative history could not change the unambiguous ordinary meaning of a statutory phrase, *see id.* at 98, that statement was based on the Court's observation that, in enacting § 1988, Congress intentionally "chose . . . to enact more restrictive language" than that in the 34 statutes that explicitly shift both attorney's fees and expert fees, *id*. at 99. The Conference Report indicates, as footnote 5 acknowledges, that Congress made a different choice in enacting the fee-shifting provision of the IDEA: instead of relying on the ordinary meaning of the term "attorney's fees," it chose to define the phrase "attorney's fees as part of the costs" as a term of art to include fees for experts' services. Thus, while *Casey* instructs that legislative history cannot alter the ordinary meaning of a statutory phrase that the Court has construed, nothing in *Casey* precludes reference to legislative history clearly indicating that Congress intends to depart from the ordinary meaning of a statutory phrase and to define that phrase as a term of art.

In disregarding the Conference Report as evidence of congressional intent, my colleagues reason that if the Supreme Court in *Casey* had viewed Congress's "apparent effort" in enacting IDEA's fee-shifting provision to depart from the ordinary meaning of the term "attorney's fees" as successful, it would have listed 35 statutes instead of 34. *See* Op. at 10. In listing the 34 statutes, however, the Court did not purport to catalog every statute that authorizes the shifting of fees for experts' services; rather, it identified only the statutes that "*explicitly* shift attorney's fees *and* expert witness fees," *Casey*,

499 U.S. at 89 (first emphasis added), saying nothing, other than in footnote 5, about statutes like the IDEA that implicitly do so by defining the phrase "attorney's fees as part of the costs" as a term of art to include fees for experts' services. Thus, the fact that the IDEA is not included in the list of statutes that explicitly shift both attorney's fees and expert witness fees does not indicate that the Court viewed Congress's "apparent effort" to depart from the ordinary meaning of "attorney's fees" as unsuccessful. Nor does footnote 5 itself indicate that the "apparent effort" was a failure. While the word "apparent" can mean "ostensible rather than actual," suggesting that the effort was unsuccessful, it can also mean "capable of being easily understood," or "obvious," suggesting that the effort was successful. *See* RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 64-65 (1999). Thus, in concluding that the Court in *Casey* viewed the "apparent effort" as a failure, my colleagues read too much into footnote 5.

My colleagues also read too much into *Crawford Fitting*, essentially adopting the overreading by the Seventh and Eighth Circuits in *T.D.* and *Neosho*. *See* Op. at 6. While the Eighth Circuit acknowledged in *Neosho* that the phrase "attorney's fees as part of the costs" in the IDEA "assumes, by its construction, that costs include something more than attorney's fees," 315 F.3d at 1031 (quoting *Pazik v. Gateway Reg. Sch. Dist.*, 130 F. Supp. 2d 217, 220 (D. Mass. 2001)) (internal quotation marks omitted), it concluded based on *Crawford Fitting* that "[a]bsent a specific definition of costs," the recovery of expert fees is limited by 28 U.S.C. §§ 1821 and 1920, *id.* Noting that the "plain language" of the IDEA's fee-shifting provision does not explicitly authorize the shifting of fees for experts' services in excess of the limits set in 28 U.S.C. §§ 1821 and 1920, the Eighth Circuit concluded that the "apparent effort" to shift fees for experts' services in the Conference Report was "unsuccessful" because it was not the kind of "explicit statutory

authority" required by *Crawford Fitting*. *Id.* at 1032. Adopting the Eighth Circuit's reasoning, the Seventh Circuit in *T.D.*, 349 F.3d at 481-82, agreed.

The Supreme Court held in *Crawford Fitting* that a court may not shift expert witness fees in excess of the amounts authorized in 28 U.S.C. §§ 1821 and 1920 "absent contract or explicit statutory authority to the contrary." 482 U.S. at 439. As the separate opinions of Justice Blackmun and Justice Marshall indicate, the Court in *Crawford Fitting* did not reach the question whether § 1988, or any other statute, authorized the shifting of expert witness fees. *See id.* at 445 (Blackmun, J., concurring); *id.* at 446 n.1 (Marshall, J., dissenting). In that case, involving the antitrust laws, the district court invoked no specific statute in shifting expert witness fees, instead relying solely on its general discretion to award costs under Rule 54(d) of the Federal Rules of Civil Procedure. *See id.* at 438-39. Thus, in the context of the *Crawford Fitting* decision, the phrase "explicit statutory authority" refers not to explicit statutory language, but to specific statutory authority apart from the court's general discretion to shift costs under a procedural rule. *See id.* Indeed, the Court emphasized the necessity of "plain evidence of congressional intent to supercede" the limits set in 28 U.S.C. §§ 1821 and 1920. *Id.* at 445. While it is true that the Court indicated that explicit statutory text would serve as plain evidence of congressional intent to shift expert witness fees, it did not state that statutory text was the only acceptable evidence of congressional intent. Rather, the Court stated:

> We will not lightly infer that Congress has repealed §§ 1920 and 1821, either through Rule 54(d) or any other provision not referring explicitly to witness fees. As always, "'[w]here there is no *clear* intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.'"

*Id*. (alteration and emphasis in original) (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976)). By stating that it would not *lightly* infer authority to shift expert witness fees absent an explicit statutory provision, the Court acknowledged that there may be certain circumstances in which it would infer such authority based on plain evidence of clear congressional intent. Because this court treats conference reports as strong evidence of congressional intent, *see Moore*, 907 F.2d at 176, and because the Conference Report accompanying the IDEA's fee-shifting provision provides plain evidence that Congress clearly intended for the statutory phrase "attorney's fees as part of the costs" to authorize the shifting of fees for experts' services, that statutory phrase provides the "explicit statutory authority" required by *Crawford Fitting*.

Accordingly, I would reverse and vacate the order of the district court denying appellants an award of fees for experts' services in excess of the amounts set in 28 U.S.C. §§ 1821 and 1920, and I respectfully dissent.